CLERK'S OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
JUL 15 2010
JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ALBERT G. BARON, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 6:09-CV-00035 |
| MICHAEL J. ASTRUE, Commissioner of Social Security, | ) By: Hon. Michael F. Urbanski<br>United States Magistrate Judge |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff Albert G. Baron ("Baron") brought this action for review of the Commissioner of Social Security's ("Commissioner") decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act"). On appeal, Baron argues that the Commissioner erred in his evaluation of the medical evidence in the record. He further argues that the Commissioner erred in determining that jobs exist in significant numbers in the national economy that Baron can perform. The Commissioner's decision that Baron is not disabled under the Act was supported by the opinions of multiple treating physicians, as well as by Dr. Robert Muller. The Commissioner's decision was also supported by the opinion of a medical expert who testified at the hearing that Baron's symptoms do not meet or equal the listings, and by Bonnie Martindale, the vocational expert who testified at the hearing that there are jobs in the national economy that Baron can perform. Because the Commissioner's decision is supported by substantial evidence, it is **RECOMMENDED** that the Commissioner's decision be affirmed.

# I.

Section 405(g) of Title 42 of the United States Code authorizes judicial review of the Social Security Commissioner's denial of social security benefits. Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001). "'Under the Social Security Act, [a reviewing court] must uphold the factual findings of the [Administrative Law Judge] if they are supported by substantial evidence and were reached through application of the correct legal standard.'" Id. (alteration in original) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). "Although we review the [Commissioner's] factual findings only to establish that they are supported by substantial evidence, we also must assure that his ultimate conclusions are legally correct." Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980).

The court may neither undertake a de novo review of the Commissioner's decision nor re-weigh the evidence of record. Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992). Judicial review of disability cases is limited to determining whether substantial evidence supports the Commissioner's conclusion that the plaintiff failed to satisfy the Act's entitlement conditions. See Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966). Evidence is substantial when, considering the record as a whole, it might be deemed adequate to support a conclusion by a reasonable mind, Richardson v. Perales, 402 U.S. 389, 401 (1971), or when it would be sufficient to refuse a directed verdict in a jury trial. Smith v. Chater, 99 F.3d 635, 638 (4th Cir. 1996). Substantial evidence is not a "large or considerable amount of evidence," Pierce v. Underwood, 487 U.S. 552, 565 (1988), but is more than a mere scintilla and somewhat less than a preponderance.

Perales, 402 U.S. at 401. If the Commissioner's decision is supported by substantial evidence, it must be affirmed. 42 U.S.C. § 405(g); Perales, 402 U.S. at 401.

"Disability" is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The "[d]etermination of eligibility for social security benefits involves a five-step inquiry." Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). This inquiry asks whether the claimant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his or her past relevant work; and if not, (5) whether he or she can perform other work. Heckler v. Campbell, 461 U.S. 458, 460–62 (1983); Johnson v. Barnhart, 434 F.3d 650, 654 n. 1 (4th Cir. 2005) (citing 20 C.F.R. § 404.1520). If the Commissioner conclusively finds the claimant "disabled" or "not disabled" at any point in the five-step process, he does not proceed to the next step. 20 C.F.R. § 404.1520(a)(4). Once the claimant has established a prima facie case for disability, the burden then shifts to the Commissioner to establish that the claimant maintains the residual functional capacity ("RFC"),[1] considering the claimant's age, education, work experience, and impairments, to perform alternative work that exists in

---

[1] RFC is a measurement of the most a claimant can do despite his limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. RFC is to be determined by the ALJ only after he considers all relevant evidence of a claimant's impairments and any related symptoms (e.g., pain). See 20 C.F.R. § 404.1529(a).

the local and national economies. 42 U.S.C. § 423(d)(2)(A); Taylor v. Weinberger, 512 F.2d 664, 666 (4th Cir. 1975).

## II.

Baron was born in 1963, and alleges a disability onset date of July 21, 2004. (Administrative Record, hereinafter "R.," 256–59.) He claims that he is disabled because he suffers from fibromyalgia, chronic pain syndrome, and depression. (Pl.'s Mem. Supp. Summ. J. 3.) Baron filed an application for DIB on August 11, 2004. (R. 256–59.) His claim was rejected both initially and on reconsideration. (R. 164–66, 168–70.) Baron requested a hearing before an Administrative Law Judge [ALJ] on March 21, 2005. (R. 171.) The claim was heard by an ALJ on March 2, 2006. (R. 40.) The ALJ denied Baron's claim in a decision dated March 28, 2006. (R. 155–63.) Upon review, the Appeals Council remanded the case to the ALJ based on a finding that the recording of the hearing was "partially inaudible and the transcript ha[d] numerous indaudibles especially during the important testimony of the medical expert." (R. 219.) An ALJ conducted a second hearing on July 1, 2008, and again denied Baron's claim in a decision dated July 15, 2008. (R. 27–39.) The Appeals Council denied Baron's request for review of the second ALJ decision, and this appeal followed. (R. 7–9.)

## III.

The issues in this appeal are: (1) whether the Commissioner erred in his evaluation of the medical evidence in the record; (2) whether the Commissioner erred in determining that jobs exist in significant numbers in the national economy that Baron can perform; and (3) whether the Commissioner erred in finding that Baron could perform

gainful activity based on a hypothetical that omitted limitations as to reliability. Review of the evidence in the administrative record in this case reveals that Baron did not meet his burden of demonstrating that he was totally disabled and that the Commissioner's decision was supported by substantial evidence.

Baron has alleged that he has suffered from pain throughout his body since as early as 2000. (R. 291.) Baron was seen by Darlene Nigro, M.D., at Bedford Medical, Inc., on March 18, 2004. (R. 403.) Dr. Nigro initially diagnosed him with myalgias, muscle spasms, anxiety, and insomnia, and prescribed various medications. She referred him to a rheumatologist, and by April, 2004 was adjusting her diagnoses to consider whether Baron suffered from fibromyalgia. (R. 402.) On June 23, 2004, she told Baron to stop working until June 28. (R. 400.)[2] On August 11, 2004, Baron filed a claim for disability insurance, based on the pain that he suffers. Dr. Nigro diagnosed Baron with fibromyalgia on August 20, 2004, nine days after he filed his original claim for disability insurance. (R. 395.) Dr. Nigro referred Baron to a rheumatologist, and he was seen by John Pendleton, M.D., on September 1, 2004. Dr. Pendleton found no arthropathy that would account for his symptoms of pain. (R. 357.) He determined that Baron merely had mild wear and tear that was consistent with his age, and that he was generally healthy. (R. 356.) He encouraged Baron to remain as active as possible. (Id.)

During the years that followed, as Baron's disability claim made its way through the administrative system to this court, he saw a number of doctors for treatment for his medical and psychological conditions. On October 14, 2004, Julie Jennings, Ph.D., undertook a psychiatric review of Baron. She determined that he had affective disorders,

---

[2] Baron initially took a leave of absence from his job at General Shale, but Dr. Nigro continued to extend the date at which he should return to work, and he has not returned to work since June 23, 2004.

but that the limitations imposed by this were only mild. (R. 369, 379). She concluded that the evidence did not establish the presence of "C" criteria in Baron's case. (R. 380.)

Between November, 2004 and February, 2005, Baron saw MSW Intern Anthony E. Emmons. Mr. Emmons recorded that Baron's objective from the counseling was to obtain disability compensation. (R. 466.) On November 30, 2005, Jeffrey B. Luckett, Ph.D., performed a Mental Status Evlauation and Psychological Assessment on Baron, based on a referral by Disability Determination Services. Dr. Luckett concluded that Baron "may not be able to work in an eight-hour day or 40-hour week, but he may be able to work half-time of four hours a day and 20 hours a week." (R. 420.)

Unfortunately, Baron was involved in a motor vehicle accident on June 12, 2007. He experienced pain in his right leg and right shoulder immediately following the accident, which was worse the following day. (R. 527.) He went to Bedford Memorial Hospital, where he was given pain medication. (R. 516–17.) He had a follow-up for his continuing shoulder pain with Virginia Blanks, M.D., on June 25, 2007. Dr. Blanks found that he had difficulty abducting his shoulder and concluded that Baron had an impingement syndrome and some AC separation. (R. 527–28.) She prescribed pain medication and referred him to an orthopedist. Baron was seen by John Mann, M.D., of Roanoke Orthopaedic Center on July 12, 2007. Of Baron's past medical history, Dr. Mann reported that he "has been remarkably healthy. He has no significant medical problems."[3] (R. 509.) Dr. Mann ordered an MRI of Baron's shoulder, to rule out the possibility of a rotator cuff injury. Baron had a follow-up appointment at Roanoke

---

[3] Based on Dr. Mann's records, it appears that Baron did not report any of his past problems with pain throughout his body, nor did he mention his diagnosis of fibromyalgia. Baron seemingly mentioned only an "AC joint separation 15 or 16 years ago" and a deformity in his right shoulder that he claims he has always had. (R. 509.)

6

Orthopaedic Center following the MRI of his shoulder. He reported to the orthopedist, Brent Johnson, M.D., that his shoulder pain had improved but that he still had difficulty lifting his arm. Dr. Johnson determined that Baron had right rotator cuff tendonitis, with the possibility of a superior labrum anterior and posterior tear. (R. 513.) Baron received an injection of pain medication and was given stretching exercises to perform. (Id.) In addition, he was given a prescription for physical therapy.[4]

Baron met with Jill Goldman, M.D., of the Virginia Department of Rehabilitative Services, for a consultation on March 6, 2008. She found that, although his reports were credible, Baron's movements were at times exaggerated. (R. 473.) Based on his medical records and a physical examination, Dr. Goldman concluded that he "should be able to work at least a light job, possibly a medium level of work at times." (Id.) On March 16, 2008, Baron consulted Marvin A. Gardner, Jr., Ph.D., of the Virginia Department of Rehabilitative Services, for a psychological examination. Dr. Gardner noted that he viewed no physical postural presentation of pain, and that Baron was able to stoop to pick up an object from the floor without exhibiting any pain. (R. 482–83.) He further noted that Baron's disclosures were "somewhat exaggerated as to symptoms." (R. 487.) Based on medical records and a mental status examination, Dr. Gardner concluded that Baron would be "able to perform simple and repetitive tasks and maintain regular attendance in the workplace," and that his psychiatric condition would not prevent him from completing a normal workweek. (Id.)

Baron began seeing George Wagner, M.D., on March 31, 2008. In his initial interview with him, Dr. Wagner noted that Baron was seeking disability compensation.

---

[4] There is no evidence in the medical record concerning whether or not Baron ever undertook physical therapy treatment.

(R. 534.) Dr. Wagner saw Baron again on May 1, 2008 and May 22, 2008. Following these three visits, he filled out a Physical Limitations Assessment, in which he concluded that Baron was totally disabled from any work activity. (R. 540.) Baron refers to Dr. Wagner as his treating physician, although the evidence of record shows that he was seen by Dr. Wagner only from March 31, 2008 until November 14, 2008. (R. 543.)

Baron's first claim is that the ALJ erred by improperly evaluating the medical record. Specifically, he asserts that the ALJ improperly ignored the opinion of Dr. Luckett, failed to properly evaluate the opinions of other experts, and failed to properly evaluate and weigh the opinions of his treating physicians. Baron saw Dr. Luckett at the Commissioner's request. Baron reported to Dr. Luckett that, on a scale of one to ten, with ten being excruciating, his daily pain level averages ten. (R. 418.) He reported that he can only walk one city block at a time before he experiences pain in his lower back, shoulders, and neck. (R. 419.) Dr. Luckett concluded, based on his responses to a variety to questions, that Baron may have been exaggerating his symptoms to make his health appear worse than it was. (R. 421.) Dr. Luckett concluded, however, that Baron "may not be able to work in an eight-hour day or 40-hour week, but he may be able to work half-time of four hours a day and 20 hours a week." (R. 420.) He further opined that Baron may have questionable reliability in a workplace "because of his pain condition and his tendency to orbit around his pain and physical status." (Id.) He concluded that in Axis I, Baron suffers from a chronic pain disorder associated with psychological factors and general medical condition, and recurrent major depressive disorder. (R. 424.) He further concluded that in Axis III, Baron suffers from fibromyalgia. (Id.)

8

Baron's argument that the ALJ ignored the opinion of Dr. Luckett in rendering his decision lacks merit. In his decision, the ALJ described the consultative examination that Dr. Luckett performed on Baron, as well as Dr. Luckett's conclusions. (R. 31.) In addition, although he did not cite to his examination specifically, the ALJ incorporated Dr. Luckett's findings in his assessment of Baron's Residual Functional Capacity ("RFC"). For instance, the ALJ considered Baron's ability to carry out instructions and interact with others in the workplace. (R. 34.) Both of these issues where evaluated by both Dr. Luckett and Dr. Gardner. Dr. Luckett found that Baron's ability to understand an remember short, simple instructions was not at all impaired, that his ability to carry out short, simple instructions was slightly impaired, and that his ability to make judgments on simple work-related decisions was moderately impaired. (R. 425.) He found that Baron's ability to understand, remember, and carry out detailed instructions was markedly impaired. (R. 425.) Dr. Luckett found that his abilities to interact appropriately with supervisors and co-workers and to respond appropriately to changes in a routine work setting were moderately impaired, and his abilities to interact appropriately with the public and respond appropriately to work pressure in a usual work setting were markedly impaired. (R. 426.) The ALJ found that Baron can:

> [P]erform jobs that accommodate mild limitations in his abilities to understand, remember and carry out simple instructions and make judgments on simple work-related decisions; that accommodate marked limitations in his abilities to understand, remember and carry out complex instructions, to make judgments on complex work-related decisions and to interact appropriately with the public; and that accommodate moderate limitations in his abilities to interact appropriately with supervisors and co-workers and to respond appropriately to usual work situations and to changes in a routine work setting.

9

(R. 34.) Overall, the ALJ's assessment of Baron's RFC was very similar to Dr. Luckett's assessment. The ALJ only found less restrictive limitations in one area. At the very least, based on his RFC assessment and his discussion of Dr. Luckett's examination of Baron, the ALJ considered Dr. Luckett's findings when rendering his decision.

Baron also argues that the ALJ ignored Dr. Luckett's finding that he "may not be able to work in an eight-hour day or 40-hour week, but he may be able to work half-time of four hours a day and 20 hours a week." (R. 420.) This finding, however, was contradicted by the opinion of Dr. Goldman, who determined that Baron can perform at least a light job. (R. 473.) In addition, Dr. Gardner determined that Baron can complete a normal workweek without interruption from his medical condition. (R. 487.) In the face of contradictory opinions, the ALJ must weigh the evidence of the record. A treating source may, when it is "not inconsistent with the other substantial evidence" in the record, be accorded controlling weight. 20 C.F.R. § 416.927(d). Dr. Luckett is not a treating physician in this case; he merely performed a consultative examination on Baron. In addition, the statement Baron emphasizes was made in the context of a discussion about the pain from which he suffers. Dr. Luckett, however, was performing a mental status evaluation and psychological assessment, not a physical examination or assessment. On the other hand, Dr. Gardner reported in his psychological examination that Baron's psychiatric condition would not impede his ability to complete regular workdays or workweeks. (R. 487.) Dr. Goldman performed a physical examination, and determined that Baron could work a light job. (R. 473.) In this case, the ALJ determined that, based on the record as a whole, Baron is able to work. Because substantial evidence supports this conclusion, the undersigned cannot conclude that the ALJ was in error.

Baron also argues that the ALJ failed to properly evaluate the findings of the other experts. He argues that the ALJ incorrectly weighed the conclusions regarding the validity of his pain and the impact of his pain on his work attendance. Contrary to Baron's argument, the ALJ properly considered and weighed the testimony and findings of all the experts in this case. In addition to Dr. Luckett, two experts examined Baron, Dr. Goldman and Dr. Gardner. Dr. Goldman noted that Baron suffers from pain; however, she found his credibility lacking. She noted that "his response to movement was exaggerated and his cooperative [sic] at times was questionable. His symptoms are vague and do not suggest specific medical diagnoses." (R. 473.) Dr. Gardner, who performed a psychological examination on Baron, agreed with this assessment, noting that Baron's "self-disclosures are regarded as somewhat exaggerated as to symptoms." (R. 487.) Both of these examining experts concluded that Baron would be able to complete a normal workday. Dr. Gardner did make a note on his examination form that Dr. Luckett had found that Baron's somatic disorder would result in poor work attendance; however, Dr. Gardner himself concluded that Baron's attendance would not be impeded by his psychiatric condition. (R. 487, 490.)

Dr. Robert Muller provided testimony at the ALJ hearing as a medical expert. His testimony was based only on Baron's medical record, as he did not examine Baron. As a psychologist, his testimony was limited to Baron's mental state and condition. Dr. Muller agreed that it was reasonable for Dr. Luckett to conclude, as a licensed clinical psychologist, that the way Baron experiences his physical pain might lead to poor

workplace attendance.[5] (R. 118.) Dr. Muller did not reach his own conclusion about Baron's attendance.

The ALJ did not determine that Baron's complaints of pain are invalid or unfounded. Rather, he found that Baron suffers from polyarthralgias, fibromyalgia, a somatoform disorder, borderline intellectual functioning, a depressive disorder, and an anxiety disorder. (R. 30.) The ALJ concluded, however, that there exists in the national economy significant work which Baron can perform, in spite of his pain. Although the ALJ did not explicitly render a decision with regard to Baron's reliability in the workplace, he necessarily had to conclude this in order to determine that there is work which he can perform. There is substantial evidence to support the ALJ's conclusion that Baron can maintain workplace attendance. As described above, Dr. Gardner determined that Baron can complete a normal workweek without interruption from his medical condition. (R. 487.) Dr. Goldman found that Baron should be able to work, without expressing concerns with his reliability. (R. 473.) And although Dr. Luckett found that Baron's pain might result in poor reliability, he also explained that there might simply be "refusal to continue if pain increases." (R.426.) Because substantial evidence supports his finding, the ALJ did not err in evaluating the findings of the examining and testifying experts.

Baron further argues the Commissioner did not properly evaluate and weigh the evidence of his treating physician, Dr. George Wagner. According to the record in this case, Baron began seeing Dr. Wagner on March 31, 2008. (R. 534.) Baron saw Dr. Wagner again on May 1 and May 22. (R. 531–32.) On June 11, 2008, Dr. Wagner

---

[5] Dr. Muller agreed that this was also a reasonable conclusion for Dr. Gardner to make; however, his agreement was based on question that assumed that Dr. Gardner concluded that Baron would have poor work attendance. (R. 118.)

12

completed a Physical Limitations Assessment on Baron and concluded that he is totally disabled from any work activity. (R. 540.) Baron argues that Dr. Wagner is his treating physician and that his opinion was supported by other medical evidence, and that his conclusion should, therefore, be given controlling weight. This argument lacks merit.

A treating physician is granted controlling weight when his opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2). The ALJ considered Dr. Wagner's opinion, but granted it only minimal weight. He made this decision because Dr. Wagner's conclusion was at least partly based on Baron's subjective complaints rather than Dr. Wagner's objective findings, the opinion was "contrary to the minimal findings on examination," and Baron visited him only four times before Dr. Wagner gave that opinion. (R. 37.)

Treating physicians' opinions are given greater weight because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [one's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations . . . ." 20 C.F.R. § 404.1527(d)(2). This rationale does not support giving Dr. Wagner's opinion controlling weight here. As the ALJ noted in his decision, Baron only visited him four times before Dr. Wagner concluded that Baron is totally disabled. Dr. Wagner could not have been able to provide the kind of longitudinal picture of Baron's impairments that the regulation foresees in granting deference to treating physicians. In this regard, it is worth noting that Dr. Wagner's note

during his initial March 31, 2008 examination of Baron states that he was "[s]eeking disability." (R. 534.)

The ALJ's decision not to grant Dr. Wagner's opinion controlling weight is well-supported in this case. Dr. Wagner's opinion that Baron is totally disabled from all work is contradicted by Dr. Wagner's own findings. At Baron's May 1, 2008 visit, Dr. Wagner noted that although Baron reported that his pain worsened each year, on that date he suffered from no body aches. (R. 532.) Yet during the examination itself, Baron stated that his muscles were tender "in various areas." (R. 534.) On his May 22, 2008 report of his examination of Baron, Dr. Wagner reported under the "Pain Assessment" heading the following: "Pain The patient comes in to get paper work for his disability claim [sic]." (R. 531.) His assessment was that Baron had "multiple areas of pain and stiffness back, shoulders. Forms filled out for attorneys." (Id.) There was no other reference to Baron's level of pain, his depression, or his inability to perform daily activities or work functions during any of the three visits during March and May of 2008. Dr. Wagner did not diagnose Baron with any particular disorders; he merely noted Baron's prior diagnoses and drug treatments based on his medical history, and provided prescriptions for medications.

Dr. Wagner's Physical Limitations Assessment of Baron reported, "per patient," that Baron can lift up to ten pounds, can sit for four to six hours during an eight-hour workday, and can sit without interruption for up to two hours. (R. 538.) He reported that Baron can stand for less than two hours during an eight-hour workday, but can stand or walk for two hours without interruption.[6] (Id.) Dr. Wagner found that Baron can

---

[6] In his report of Baron's ability to sit, Dr. Wagner noted that his assessment was "per patient MD can not determine." (R. 538.) Dr. Wagner did not make the same notation in his assessment of Baron's ability to

14

occasionally stoop, climb, balance, crouch, kneel, and crawl, and that he can frequently push/pull. (R. 539.) He found that Baron can occasionally reach, finger, and feel, and that he can frequently handle. (Id.) Based on Baron's subjective complaints, the only environmental restrictions that Dr. Wagner noted were regarding moving machinery and temperature extremes. (Id.) These findings do not correspond with Dr. Wagner's finding that Baron is totally disabled.

In addition, Dr. Wagner's opinion is not well-supported by the other evidence of record. Baron testified that he is able to perform a variety of household tasks. He cares for his young daughter from Sunday until Thursday each week. (R. 94.) During that time he drives her twenty minutes to school, spends time with her outside in his yard, and helps her with her homework. (R. 96, 99.) He is able to cook meals, though he stated that he generally microwaves their meals. (R. 100.) He also mows his lawn using a riding lawn mower; this takes him approximately two to two and a half hours, although he stated that he only mows for one hour at a time. (R. 95–96.) He shops for groceries and household items once a week for approximately forty-five minutes to one hour. (R. 97.) In addition, he spends some time each week collecting, repairing, and selling scrap parts from cars and riding lawn mowers. (R. 99.) Baron's ability to complete these tasks does not support a finding of total disability.

Other evidence in the record fails to support Dr. Wagner's determination that Baron is totally disabled from work. For instance, Dr. Pendleton, a rheumatologist, found little to explain Baron's pain. (R. 348.) He determined that Baron does not have arthritis, and because he saw no restrictions to Baron's activity he decided not to bar him from

---

stand and walk. It is unclear why Dr. Wagner was unable to assess on his own Baron's ability to sit, but able to objectively determine Baron's ability to stand and walk for two hours.

15

working. (Id.)⁷ Doctors Astruc and Hayes completed a Physical Residual Functional Capacity Assessment on Baron, and found that he could occasionally lift/carry fifty pounds, frequently lift/carry twenty-five pounds, and stand/walk for a total of six hours during an eight-hour workday. (R. 383.) They determined that his ability to push/pull was unlimited, and that he required no postural, manipulative, visual, or communicative limitations. (R. 384–85.) They found that Baron should avoid exposure to extreme temperatures, wetness, and humidity, but that he required no other environmental limitations. (R. 385.) They adopted Dr. Pendleton's record, including his conclusion that there was no reason to keep Baron out of work. Thus, despite finding similar limitations to those Dr. Wagner found, the agency physicians did not conclude that Baron was totally disabled.

On October 28, 2004, Bedford Medical, Inc., where he was treated by Dr. Nigro, declined to provide Baron with a letter confirming his disability, stating that "he has never seen a disability doctor and he has not been declared disabled." (R. 388.) Dr. Samarasinghe, a pain specialist to whom Baron was referred by Dr. Nigro, noted that he was "very disability focused," that his myofascial pain syndrome was exacerbated by his psychological condition, and that he could not do anything for Baron. (R. 408.) Professionals at the Kuumba Community Health and Wellness Center, who saw Baron from March until September, 2005, noted repeatedly that exercise would help ease the pain of fibromyalgia, but they found that Baron did not maintain an exercise regime. (R. 440–45.) Dr. Gardner reported in his psychological examination that Baron's psychiatric condition would not impede his ability to complete regular workdays or workweeks. (R. 487.) Dr. Goldman, rather than determining that Baron was totally disabled, determined

---

⁷ Nonetheless, Dr. Wagner recorded that Baron has a medical history that includes arthritis. (R. 531–32.)

that he could work at least a light job. (R. 473.) It is clear that Dr. Wagner's conclusion that Baron was totally disabled flies in the face of the other medical evidence and opinions in the record, and is therefore not entitled to controlling weight. Thus, the ALJ did not err in refusing to grant Dr. Wagner's opinion controlling weight.

Baron's second argument is that the ALJ erred in his determination that there are jobs that exist in significant numbers in the national economy that the claimant can perform. Because the ALJ found that Baron was limited to work at a level less than a full range of medium work, and that Baron could no longer perform his past work, the ALJ had the burden to determine whether there is work that Baron can perform, and that this work exists in significant numbers in the national economy. 20 C.F.R. §§ 416.912(g), 416.960(c).

The Vocational Expert ("VE") testified at Baron's July, 2008 hearing that, based on the limitations outlined by the ALJ, Baron would not be able to perform his previous jobs. (R. 124.) Based on his limitations, the VE concluded that Baron could perform a job as a hand packager, at either a light or sedentary level. (R. 144–45.) The VE testified that there are 28,000 sedentary hand packager jobs in the national economy, and 650 such jobs in Virginia. (R. 130.) She testified that there are 407,000 light hand packager jobs nationally, and 9,300 in Virginia. (Id.) Baron is correct that the VE was unable to give a specific number of hand packager positions with a sit/stand option, which he requires because of his physical limitations. However, based on his experience doing labor market surveys and going into factories, the VE was able to say that "probably half" of the hand packager jobs would allow a sit/stand option. (R. 145–47.) The ALJ noted in his decision that the DOT does not address the sit/stand option, but that such an option

17

exists based on the VE's experience. He concluded that jobs exist in the national economy in significant number which Baron can perform. (R. 39.) When the number of sedentary and light hand packager jobs that exist in the national and local economies is cut in half, there are still a significant number of such jobs that exist. Thus, the ALJ's conclusion that jobs exist in the national economy in significant number which Baron can perform is supported by substantial evidence.

Baron's final argument is that the ALJ erred in not including all of Baron's limitations, specifically his reliability, in the hypothetical that he propounded to the VE. The ALJ did question the VE as to what effect absences might have on Baron's ability to remain employed. The VE testified that a person with poor attendance is unlikely to remain employed. (R. 139.) The hypothetical upon which the VE based his ultimate conclusions, that Baron can perform the jobs of sedentary and light hand packager, merely accounted for the sit/stand option and did not account for periodic absences. However, the hypothetical offered to a VE need only contain all of the limitations of record. In this case, the ALJ determined that Baron could maintain regular attendance at the workplace, and therefore did not include an attendance limitation in the final hypothetical that he offered to the VE. There is substantial evidence to support the ALJ's conclusion that Baron can maintain attendance. As described above, Dr. Gardner determined that Baron can complete a normal workweek without interruption from his medical condition. (R. 487.) Dr. Goldman found that Baron should be able to work, without expressing concerns with his reliability. (R. 473.) And although Dr. Luckett found that Baron's complaints of pain might result in poor reliability, he also explained

that there might simply be "refusal to continue if pain increases." (R.426.) Therefore, it was not reversible error for the ALJ to omit a reliability limitation from the hypothetical.

Taken together, therefore, the administrative record contains substantial evidence to support the ALJ's conclusion that Baron was not totally disabled and that jobs exist in the national economy which Baron can perform.

## IV.

At the end of the day, it is not the province of the court to make a disability determination. It is the court's role to determine whether the Commissioner's decision is supported by substantial evidence, and, in this case, substantial evidence supports the ALJ's decision. In recommending that the final decision of the Commissioner be affirmed, the undersigned does not suggest that Baron is free from pain throughout his body. Careful review of the medical records compels the conclusion that Baron has not met his burden of establishing that he is totally disabled from all forms of substantial gainful employment. The ALJ properly considered all of the subjective and objective factors in adjudicating plaintiff's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence.

The Clerk is directed to transmit the record in this case to Hon. Norman Moon, United States District Judge. Both sides are reminded that pursuant to Rule 72(b), they are entitled to note any objections to this Report and Recommendation within fourteen (14) days hereof. Any adjudication of fact or conclusion of law rendered herein by the undersigned that is not specifically objected to within the period prescribed by law may become conclusive upon the parties. Failure to file specific objections pursuant to 28 U.S.C. § 637(b)(1)(C) as to factual recitations or findings as well as to the conclusion

reached by the undersigned may be construed by any reviewing court as a waiver of such objection.

The clerk is also directed to send a copy of this Report and Recommendation to all counsel of record.

Entered: July 15, 2010.

/s/ Michael F. Urbanski

Michael F. Urbanski
United States Magistrate Judge